[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12077

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CARLOS DANIEL CANARIO-VILOMAR,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cr-20019-BB-1

_____

_____

No. 22-13554

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANTONIO LEMUS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cr-00026-SCB-AAS-4

_____

Before JILL PRYOR, NEWSOM, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Antonio Lemus and Carlos Daniel Canario-Vilomar appeal their separate convictions for cocaine-related charges under the

Maritime Drug Law Enforcement Act ("MDLEA").[1]  On appeal, Lemus and Canario-Vilomar contend that the district court lacked subject-matter jurisdiction because the MDLEA exceeds Congress's authority under the Felonies Clause of the Constitution. Both appellants argue that Congress overstepped its bounds by defining a "vessel without nationality" in 46 U.S.C. § 70502(d)(1)(C) to include vessels that are not recognized as stateless under international law.  Canario-Vilomar also argues that his offense occurred in the Exclusive Economic Zone ("EEZ") of a foreign nation, and that EEZs fall beyond the "High Seas" that Congress has authority to regulate.

After careful review, we affirm.  The Framers did not curtail Congress's authority under the Felonies Clause by incorporating any limitations under international law.  Congress, therefore, did not act beyond the grant of authority in the Felonies Clause when defining either a "vessel without nationality" or the "high seas."

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Lemus's Proceedings

On December 30, 2021, officers on board a United States Customs and Border Patrol aircraft identified a boat called a "go-fast vessel," or "GFV," approximately 37 nautical miles north of Panama.  Two United States Coast Guard cutters moved to intercept the GFV and, in their pursuit, saw four people  jettisoning packages of suspected contraband into the water.  A Coast Guard

---

[1] The MDLEA is codified in 46 U.S.C. §§ 70501–70508.

helicopter fired warning shots at the GFV, which then stopped. Coast Guard officers from the cutters conducted a right-of-visit and boarded the GFV. On board, the officers identified four people: Jorge Julian Martinez, Wayne Duke, Nedry McLean, and Antonio Lemus. Martinez identified himself as the master of the vessel and claimed Colombian nationality for himself, his three passengers, and the boat. A representative of United States Coast Guard District 7 contacted the Colombian Navy, which could neither confirm nor deny the GFV's registration. District 7 then granted a statement of no objection to treat the GFV as a vessel without nationality for the purpose of enforcing United States law. In the meantime, the officers from the two Coast Guard cutters collected 40 packages—totaling about 40 kilograms—from the water. Narcotics testing of two of the packages came back positive for cocaine. In a post-*Miranda*[2] statement, Lemus admitted that he had been hired to participate in a drug-smuggling scheme directed at Panama and that he was supposed to be paid 20,000,000 Colombian pesos (about $4,881) upon completion of the crime.

A grand jury returned a two-count indictment charging Lemus and his three co-defendants with one count of conspiring to possess and distribute five kilograms or more of cocaine and one count of possessing with intent to distribute five kilograms or more of cocaine, in violation of the MDLEA. Both counts were alleged to have occurred on the high seas, on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

§§ 70503(a) and 70506(a) and (b). Another defendant, McLean, moved to dismiss the indictment for lack of jurisdiction, which Lemus adopted with the district court's permission. After the government responded, the district court denied the motion and the prosecution proceeded. Lemus pled guilty to both counts as charged in the indictment; the magistrate judge recommended accepting the plea; and the district court adjudicated Lemus guilty. Lemus was sentenced to 87 months' imprisonment followed by five years of supervised release.

## B. Canario-Vilomar's Proceedings

On December 6, 2021, a Dutch Maritime Patrol Aircraft spotted a GFV approximately 145 nautical miles north of Colombia. A helicopter and a small boat manned by the United States Coast Guard were dispatched to investigate. Once the boarding team reached the GFV, they identified three people on board: Carlos Daniel Canario-Vilomar, Jesus Calle-Balbin, and Jose Antonio Canario-Vilomar. One of the detainees claimed Dominican-Republic nationality for the vessel. The Coast Guard contacted the Dominican Republic, which advised that it could neither confirm nor deny registration of the boat. Based on that response, the GFV was treated as a vessel without nationality, subject to the jurisdiction of the United States. The Coast Guard found 19 bales and 3 packages on board the GFV and another 10 bales in the water around the GFV, all of which tested positive for cocaine. The total weight of the cocaine was more than five kilograms.

A grand jury returned an indictment charging Canario-Vilomar and the other occupants of the GFV with conspiracy to possess with intent to distribute, and substantive possession with intent to distribute, five kilograms or more of cocaine on board a vessel subject to United States jurisdiction, all in violation of the MDLEA. Canario-Vilomar pled guilty to the conspiracy charge pursuant to a written plea deal under which the government agreed to dismiss the substantive charge and make certain sentencing recommendations. Before sentencing, Canario-Vilomar and his co-defendants moved to withdraw their guilty pleas and moved to dismiss the indictment, arguing that 46 U.S.C. § 70502(d)(1)(C), under which their vessel was deemed stateless and subject to United States jurisdiction, violated international law. This provision, they contended, exceeded Congress's constitutional authority to "define and punish . . . Felonies committed on the high Seas." U.S. Const. art. I, § 8, cl. 10. In response, the government maintained that our precedent foreclosed these arguments and, in any event, that they lacked merit. In their reply, Canario-Vilomar and his co-defendants raised a new argument, contending that their vessel was in Colombia's EEZ and was thus *not* in the "high seas" within Congress's realm of regulation. The district court denied the motion to withdraw and to dismiss. As for Canario-Vilomar's EEZ argument, the district court declined to entertain it because it was improperly raised, for the first time, in the reply. At the sentencing that followed, the district court imposed a term of 120 months' imprisonment followed by two years of supervised release.

Lemus and Canario-Vilomar timely appealed, and we have consolidated their appeals for adjudication.

## II.    STANDARD OF REVIEW[3]

A district court's subject-matter jurisdiction is a question of law that we review *de novo*. *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016). Likewise, we review *de novo* the constitutionality of a criminal statute. *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010). Although a guilty plea generally waives a defendant's right to appeal his conviction, it does not waive the right to challenge the constitutionality of the statute underlying the conviction. *Class v. United States*, 583 U.S. 174, 178 (2018).

## III.    ANALYSIS

This case involves the scope of Congress's authority under the Felonies Clause, which empowers Congress to "define and punish . . . Felonies committed on the high seas." U.S. Const. art. I, § 8, cl. 10. Lemus and Canario-Vilomar raise three issues. First, both contend that Congress exceeded its authority under the Felonies Clause by defining a "vessel without nationality" to include vessels that are not stateless under international law. 46 U.S.C. § 70502(d)(1)(C). This is so, they say, because the Framers incorporated principles of international law into the Felonies Clause circumscribing Congress's authority within the contours of

---

[3] Reasonable minds may disagree about whether Canario-Vilomar properly preserved his EEZ argument, which he raised only in his reply below. For purposes of this appeal, we treat it as if it had been properly preserved without deciding whether, in fact, it was.

international law.  International law, in turn, defines a stateless vessel as either one that sails with multiple flags or with no flag at all, but not those for which a nation can neither confirm nor deny a claim of national registry.  *See, e.g.*, *United States v. Dávila-Reyes*, 23 F.4th 153, 183–85 (1st Cir. 2022), *reh'g en banc granted, opinion withdrawn*, 38 F.4th 288 (1st Cir. 2022), *and on reh'g en banc*, 84 F.4th 400 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 2634 (2024).  Thus, the appellants contend, Congress acted beyond its authority by defining "vessels without nationality" to include those for which the purported nation of registry can neither confirm nor deny that fact.

Second, Canario-Vilomar contends that his conviction cannot stand because his crime occurred in an EEZ that falls outside the bounds of the "high seas" as defined by international law.  Because he was not arrested on the "high seas" as defined by international law, he reasons, his offense "fell outside of Congress's powers under the Felonies Clause," and the district court lacked jurisdiction over his case.  Here, Canario-Vilomar's argument proceeds in two parts: first, the term "high seas" must be defined in accordance with international law; and second, under international law, the EEZ is not part of the high seas.  As his primary support, Canario-Vilomar invokes the interpretive principle of *noscitur a sociis*, suggesting that because other portions of Article I, § 8, Clause 10 are tethered to international law, so too must be the Felonies Clause.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012).

Third, Canario-Vilomar argues that the MDLEA violates principles of due process because it allows the United States to assert jurisdiction over foreign nationals for conduct that bears no nexus with the United States.  Canario-Vilomar acknowledges that this argument is foreclosed by our binding precedent in *United States v. Campbell*, 743 F.3d 802, 809–10 (11th Cir. 2014), and he raises it for preservation purposes only.

We take each issue in turn.

### A.    International Law and the Felonies Clause

Two of the issues presented—the classification of a "vessel without nationality" and the inclusion of the EEZ within the "high seas"—require us to address whether international law plays any role in Congress's definition and punishment of crimes under the Felonies Clause.  We conclude, as we now explain, that it does not.

As an initial matter, a person charged with a violation of the MDLEA "does not have standing to raise a claim of failure to comply with international law as a basis for a defense."  46 U.S.C. § 70505; *see United States v. Hernandez*, 864 F.3d 1292, 1301–02 (11th Cir. 2017).  Such a claim "may be made only by a foreign nation" and "does not divest a court of jurisdiction."  46 U.S.C. § 70505.  Accordingly, "any battle over the United States'[s] compliance with international law in obtaining MDLEA jurisdiction should be resolved nation-to-nation in the international arena, not between criminal defendants and the United States in the U.S. criminal justice system."  *Hernandez*, 864 F.3d at 1302 (rejecting a "challenge to

the way that the Coast Guard communicated with the Guatemalan government").

Nonetheless, "whether a vessel is subject to the jurisdiction of the United States is not an element of [an MDLEA] offense, but instead is solely an issue of subject matter jurisdiction that should be treated as a preliminary question of law for the court's determination." *United States v. Tinoco*, 304 F.3d 1088, 1105 (11th Cir. 2002). We have construed the "'on board a vessel subject to the jurisdiction of the United States' portion of the MDLEA as a congressionally imposed limit on courts' subject matter jurisdiction." *United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008).

The Define and Punish Clause of Article I empowers Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. This Clause contains three distinct grants of power: (1) "the power to define and punish piracies"; (2) "the power to define and punish felonies committed on the high seas"; and (3) "the power to define and punish offenses against the law of nations." *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248 (11th Cir. 2012). The second of these three grants—defining and punishing felonies on the high seas—is known as the Felonies Clause. *See id.* "We have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." *Campbell*, 743 F.3d at 810 (alteration adopted) (quoting *Bellaizac-Hurtado*, 700 F.3d at 1257). "And we have long upheld the authority of Congress to 'extend[ ] the criminal

jurisdiction of this country to any stateless vessel in international waters engaged in the distribution of controlled substances.'" *Id.* (quoting *United States v. Marino-Garcia*, 679 F.2d 1373, 1383 (11th Cir. 1982)). Accordingly, "[i]n *Campbell*, we held that the MDLEA was a constitutional exercise of Congressional authority under the Felonies Clause." *Hernandez*, 864 F.3d at 1303 (citing *Campbell*, 743 F.3d at 809–10).

We recently reaffirmed the same conclusion. *See United States v. Alfonso*, 104 F.4th 815, 825–27 (11th Cir. 2024).[4] In *Alfonso*, the appellants zeroed in on *Bellaizac-Hurtado*'s recognition that Congress's authority under the Offenses Clause—the third grant of power we described above—is cabined within "the Law of Nations." *Id.* at 824–25; *Bellaizac-Hurtado*, 700 F.3d at 1249–51. Those appellants asked us to extend the same limitation to the Felonies Clause—an invitation we declined because the plain language of these two Clauses differs in dispositive ways. *See Alfonso*, 104 F.4th at 825. Our reasoning was simple: while the Offenses Clause explicitly incorporates "the Law of Nations" as a boundary on Congress's authority, the Felonies Clause includes no such limiting language. *See id.*; U.S. Const., art. I, § 8, cl. 10 (comprising both the Offenses Clause ("Congress shall have Power . . . [t]o define and punish . . . Offences *against the Law of Nations*" (emphasis added)) and the Felonies Clause ("Congress shall have Power . . . [t]o define

---

[4] While a portion of *Alfonso* was decided under our plain-error standard, *see* 104 F.4th at 828–29 & n.18, the appellants' jurisdictional challenge (relevant to our discussion here) was reviewed *de novo*, *see id.* at 820–27.

and punish . . . Felonies committed on the high Seas")).  Finding no support for the appellants' contention, we rejected their suggestion to extend *Bellaizac-Hurtado*'s reach to the Felonies Clause.  *Alfonso*, 104 F.4th at 826.

This, we noted, is entirely consistent with our previous holding in *Campbell*.  *Id.*; *see Campbell*, 743 F.3d at 810.  As we explained above, *Campbell* reiterates that we "have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause."  743 F.3d at 810.  Because *Campbell* postdated *Bellaizac-Hurtado*, we necessarily "implicitly concluded [in *Campbell*] that international law does not limit the Felonies Clause" as it does the Offenses Clause.  *Alfonso*, 104 F.4th at 826.

Under our prior-panel-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this [C]ourt sitting *en banc*."  *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

As we concluded in *Alfonso* and conclude again today: "[T]he Felonies Clause is not limited by customary international law."  104 F.4th at 826; *see Archer*, 531 F.3d at 1352.  In other words, we reject Lemus and Canario-Vilomar's contention that Congress was constrained by international law in crafting its definition of a stateless vessel or in defining the boundaries of the high seas.  Armed with the knowledge that Congress was not restrained by international

law in crafting the MDLEA, we turn to each of the appellants' specific contentions.

### B.    A "Stateless" Vessel

The MDLEA prohibits possession with intent to distribute a controlled substance while on board a vessel subject to the jurisdiction of the United States. § 70503(a)(1), (e)(1). The MDLEA describes circumstances in which a vessel is subject to the jurisdiction of the United States, including when it is "a vessel without nationality." *Id.* § 70502(c)(1)(A). A vessel without nationality includes "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *Id.* § 70502(d)(1)(C). A claim of nationality or registry may be made, in relevant part, by "a verbal claim of nationality or registry by the master or individual in charge of the vessel." *Id.* § 70502(e)(3).

The appellants insist that the MDLEA's definition of a vessel without nationality—specifically, the inclusion of vessels for which a claimed nation can neither confirm nor deny registration—is ultra vires. Not so. As we held in *Campbell* and reaffirmed in *Hernandez*, the "MDLEA was a constitutional exercise of Congressional authority under the Felonies Clause." *Hernandez*, 864 F.3d at 1303 (citing *Campbell*, 743 F.3d at 809–10); *see also Campbell*, 743 F.3d at 810 ("We have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." (alteration adopted and internal quotation omitted))

More importantly, we held in *Alfonso* that "the Felonies Clause is not limited by customary international law." 104 F.4th at 826. It follows that international law cannot limit Congress's authority to define "stateless vessel" for purposes of the MDLEA. It is true that in our prior cases, the defendants did not raise a specific challenge to the definition of a stateless vessel. But time and time again, "we have categorically rejected an overlooked reason or argument exception to the prior-panel precedent rule." *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015); *see also id.* ("[A] prior panel precedent cannot be circumvented or ignored on the basis of arguments not made to or considered by the prior panel." (internal quotation marks omitted)). Our prior panel precedent rule, therefore, forecloses this argument from proceeding. *See Archer*, 531 F.3d at 1352.

## C.    The Exclusive Economic Zone and the High Seas

Turning next to the EEZ and the high seas, we likewise find ample binding precedent foreclosing Canario-Vilomar's position.

The EEZ, a term of relatively modern vintage, "sits just beyond a nation's territorial waters but within 200 miles of the coastal baseline." *Alfonso*, 104 F.4th at 821; *see also United States v. Rioseco*, 845 F.2d 299, 300 n.1 (11th Cir. 1988) (describing the EEZ as "a 200 nautical mile zone extending from a coastal State's baseline in which the coastal State has priority of access to living resources and exclusive right of access to non-living resources"); United Nations Convention on the Law of the Seas, pt. V, art. 55, 57, Dec. 10, 1982, 21 I.L.M. 1261, 1280 (defining the EEZ as "an area beyond and adjacent to the territorial sea" that "shall not extend beyond 200

nautical miles from the baselines from which the breadth of the territorial sea is measured," "under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention"); 33 C.F.R. § 2.30(b) (defining the EEZ as "the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States").

We also recently held—following our examination of the role of international law in the Felonies Clause—that "the EEZ is part of the 'high seas' for purposes of the Felonies Clause in Article I of the Constitution." *Alfonso*, 104 F.4th at 823. *Alfonso* did not break new ground in saying so. In *United States v. McPhee*, for example, we directly examined "whether, at the time of seizure, the [vessel] was a stateless vessel located within international waters." 336 F.3d 1269, 1273 (11th Cir. 2003). And, we held, because the vessel was beyond the "twelve-mile . . . territorial boundary" of Bahamian territorial waters, the vessel was "located within international waters" and thus subject to MDLEA jurisdiction. *Id*. at 1273, 1276. *See also United States v. Louisiana*, 394 U.S. 11, 23 (1969) ("Outside the territorial sea are the high seas, which are international waters not subject to the dominion of any single nation."); *Marino-Garcia*, 679 F.2d at 1379 n.8 (the high seas "include all waters beyond the territorial seas of the United States and beyond the territorial seas of any foreign nation"); *United States v. Beyle*, 782 F.3d 159, 167 (4th Cir. 2015) ("The question then becomes where exactly [a nation's] territorial sea ends and the high seas begin. The

weight of authority points to an outer territorial limit of twelve nautical miles[.]"); *United States v. Dire*, 680 F.3d 446, 460 n.11 (4th Cir. 2012) (noting "the twelve-mile boundary set by international law today" that "demarcat[es] a nation's territorial waters from the high seas").

In other words, "[n]othing about the modern EEZ as defined by customary international law disturbs in any way the Founding era concept of the term 'high seas' that informed the original meaning of the Felonies Clause." *Alfonso*, 104 F.4th at 823. We, in sum, reject Canario-Vilomar's view that Congress could not reach him merely because he chose to traffic drugs in Colombia's EEZ rather than farther out into the open ocean.

### D.    Due Process and Nexus

We are left, then, with only Canario-Vilomar's due process argument. Here, Canario-Vilomar says that the MDLEA violates principles of due process because it allows the United States to assert jurisdiction over foreign nationals for conduct that bears no nexus with the United States. He concedes, however, that this Court has rejected similar arguments. And we agree: Canario-Vilomar's due process argument is plainly foreclosed by our binding precedent in *Campbell*. As we have explained repeatedly, "the conduct proscribed by the [MDLEA] need not have a nexus to the United States because universal and protective principles support its extraterritorial reach." *Campbell*, 743 F.3d at 810; *Archer*, 531 F.3d at 1352.

## IV.    CONCLUSION

We thus find no merit in the appellants' contentions that Congress acted beyond its grant of authority when defining either a "vessel without nationality" or the "high seas."  And, as we have explained, Canario-Vilomar's due-process challenge is squarely foreclosed by our binding precedent.  We, therefore, affirm the appellants' convictions.

**AFFIRMED.**